# HUBBLE et al. v. CACHE COUNTY DRAINAGE DIST. NO. 3 et al.

No. 7932.   Decided July 29, 1953.   (259 P. 2d 893.)

See 28 C.J.S. Drains, sec. 29. Improvements, right of owner of easement to make. 17 Am. Jur. Easements, sec. 107; 112 A.L.R. 1307.

George D. *Preston,* Logan, for appellants.

LeRoy B. *Young,* Ogden, *Bullen & Olson,* Logan, for respondents.

WOLFE, Chief Justice.

The defendant Cache County Drainage District was cited into the court below upon an order to show cause why it should not be punished for contempt of court for alleged violation of an amended decree of the lower court. The original decree was before this court on a previous appeal, Utah, 237 P.2d 843, but while the appeal was pending, the parties entered into a stipulation for the purpose of amending the decree. We remanded the case and the amended decree was subsequently entered by the lower court on December 10, 1951.

The Cache County Drainage District Number Three is located in the Northern portion of Cache County, the natural topography dividing the district into the Northern and Southern Divisions. The drain for the Northern Division, so-called Outlet No. 1, flows across the plaintiffs' land into the Bear River, and the drain for the Southern Division, Outlet No. 2, flows across the land of individuals not involved in this suit, entering the meandering Bear River at a point further south. The amended decree adjudges the defendant Drainage District to have a perpetual ease-

ment across plaintiffs' land to drain the Northern Division through Outlet No. 1.

After entry of the amended decree, defendant Drainage District obtained the necessary consent of landowners, not including plaintiffs, to modify the manner of operation of the District so that a large portion of its drainage waters which previously flowed from the Northern Division into Outlet No. 1, flowed into Outlet No. 2, thereby reducing the area drained across plaintiffs' land from approximately 705 to 137 acres and reducing the flow of water through Outlet No. 1 by approximately 70%. This was accomplished by the construction of a new drain leading to Outlet No. 2 and an earth dam at the head of Outlet No. 1. Although the dam was destroyed by an unprecedented spring runoff, the difference in level of the drains still caused a major portion of the runoff to course through Outlet No. 2, and after the spring runoff subsided, the reduction in flow of approximately 70% remained.

In the fall of 1952, one Cyril Pitcher, owning approximately 40 acres of land located in the Northern Division of the Drainage District and situated so that drainage would be through Outlet No. 1 and across plaintiffs' land, with the knowledge and consent of defendant, constructed two new tile drains. We must assume that these new drains will increase the amount of water drained from Pitcher's land, but at the same time we again direct attention to the fact that the overall drainage burden has been lessened by approximately 70%. Since the evidence indicates that other landowners in the Northern Division are contemplating new drains, we are led to the following inquiry, all the errors assigned going to substantially the same point: Under the terms of the amended decree, is the burden on the servient estate tested by the flow of water through Outlet No. 1 on April 8, 1947, or by the number, size and location of the drains existing on the dominant estate as of April

8, 1947? In order to answer the question, it is necessary to quote portions of the amended decree as follows:

"1. That the defendant, Cache County Drainage District No. 3 (Northern Division) is hereby adjudged and decreed to have a perpetual easement over and across the lands of the plaintiffs * * * in what is designated on the map as Outfall [Outlet] No. 1, for the purpose of discharging therein and conveying across the premises of the plaintiffs, through said channel, from its artificial ditches and drains, all of the water as created, conducted and conveyed by said ditches and drains from its system *in the manner of operation as the same existed on April* 8, 1947.

"2. That the plaintiffs are entitled to and there is hereby issued an injunction against the defendant corporation forever *enjoining said defendant,* its officers, agents, or employees, *from causing any waters which may be created, developed or increased by the construction of any new drains,* either within or without the said district, or the enlargement of any old drains *where the water from said new or enlarged drain is to be coursed through plaintiff's premises,* or aiding and abetting others, either within or without the district, to drain waters into the present existing system, and across plaintiff's premises, *provided, however,* that nothing contained in this injunction shall be construed to prevent or enjoin the defendant, its officers, agents and employees, from *making any improvements to or maintenance of its drainage system as it existed on April* 8, 1947, *so long as such improvement to or maintenance of the same does not materially increase the flow of water over or increase the burden to the lands of plaintiffs* or their successors in interest, nor shall this injunction be so construed as to prevent or bar defendant from proceeding, by condemnation, in eminent domain, to acquire a legal right-of-way across plaintiff's premises, should defendant at any time elect so to do." (Italics added.)

The lower court interpreted the amended decree to mean

"that the defendants have the right to improve, enlarge and extend their drains and construct new drains within the limits of the drainage district so long as said new drains, improvements or enlargements do not increase the burden on plaintiff's land,"

and entered judgment for defendant. Both parties allege that the words used in the amended decree are plain in meaning, albeit, the parties reach opposite interpretations.

Plaintiffs maintain that the extent of the easement adjudged by the amended decree is measured by the number, size and location of drains existing on April 8, 1947, and that a right to make changes in the manner of operation, such as the construction of new drains, can only be acquired by proceedings in eminent domain. Plaintiffs complain that although the defendant Drainage District has diverted a large portion of the water which was drained through Outlet No. 1 on April 8, 1947, still defendant is unwilling to abandon its easement to that extent, retains the power to redirect the diverted water through plaintiffs' land, and if new drains are constructed to reach the former flow of water, an additional burden will be placed on plaintiffs to measure the flow from year to year and compare it with the flow as of April 8, 1947.

We think the lower court was correct in its interpretation. Although the italicized portion of paragraph one of the amended decree seemingly, as contended by plaintiffs, limits defendant's easement to the manner of operation of the Drainage District, viz., the number, size and location of the drains, paragraph two contains a proviso allowing for improvement and maintenance of the Drainage District as it existed on April 8, 1947,

"so long as such improvement to or maintenance of the same does not materially increase the flow of water over or increase the burden to the lands of plaintiffs   *   *   *."

The word "maintenance" must relate to the number, size and location of drains existing on April 8, 1947, while "improvements" must concern something new: enlarging old or constructing new drains. Thus the test of the burden on the servient estate is in terms of the flow of water through Outlet No. 1 arising from within the limits of the Drainage District and not maintenance of the status quo as to number, size and location of the drains on the dominant estate. To interpret otherwise would treat as surplusage the word "improvements." In *Salt Lake City* v. *Tellu-*

*ride Power Company,* 82 Utah 607, 17 P.2d 281, 284, this court said:

"In construing the decree, it should be construed together as a whole so as to give meaning and force to all of its terms, and, if a reasonable construction can be had which will give force to all of its wording, such a construction should be made."

Moreover, it is clear that the needs of society and the concomitant policy of the law favor changes and improvements for the benefit of the dominant estate so long as the manifest intent of the parties does not disallow the changes and the burden to the servient tenement is not increased. *Big Cottonwood Tanner Ditch Co.* v. *Moyle,* 109 Utah 213, 174 P.2d 148, 172 A.L.R. 175; *Robins* v. *Roberts,* 80 Utah 409, 15 P.2d 340.

Affirmed. Costs to respondents.

McDONOUGH, CROCKETT, HENRIOD and WADE, J.J., concur.