*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2013 UT 39**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UNION PACIFIC RAILROAD,
*Petitioner,*

*v.*

UTAH DEPARTMENT OF TRANSPORTATION; UTAH PUBLIC SERVICE
COMMISSION; ANDERSON GENEVA DEVELOPMENT, INC.,
and TOWN OF VINEYARD,
*Respondents.*

No. 20110326
Filed July 9, 2013

Original Proceeding in this Court

Attorneys:

Reha Kamas, Salt Lake City, for petitioner

Brent A Burnett, Asst. Att'y Gen., for respondent UDOT

Troy L. Booher, Christopher L. Stout, Salt Lake City, Dennis M.
Astill, Sandy, for respondent Anderson Geneva Development, Inc.

David L. Church, Salt Lake City, for respondent
Town of Vineyard

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1 This case arises out of the classification of a public railroad crossing by the Utah Department of Transportation (UDOT). The classification was upheld on review by the Public Service Commission. We affirm, upholding the Commission's determination that UDOT correctly classified the crossing as public in the absence of any formal abandonment or evidence indicating that the crossing is a new road that never became public.

I

¶2    In 2008, the Utah Transit Authority (UTA) announced construction of a high-speed commuter rail line that would run from Provo to downtown Salt Lake City. As announced, this line was to operate in a portion of a rail corridor occupied by Union Pacific Railroad and would increase train traffic from eight to twenty trains per day to over sixty trains per day. Because construction of the new commuter rail line could potentially alter certain crossings of Union Pacific's line, representatives from UTA and UDOT evaluated each identified crossing to "ensure that final design meets all applicable safety requirements." As a result of this evaluation, UTA and UDOT decided to eliminate a crossing at "Geneva Road, 4000 North" in the town of Vineyard.

¶3    It soon became clear, however, that the reference to "Geneva Road, 4000 North" was incorrect and that UTA and UDOT actually intended to close a crossing that involves 400 North and Vineyard Road. Once the Town of Vineyard and the owner of land adjacent to the crossing (Anderson Geneva) realized this, they petitioned the Commission to review UDOT's initial determination to close the crossing. As part of this petition, Anderson Geneva and Vineyard provided documents and information to UDOT about the crossing. UDOT had previously determined that the crossing was private because applicable engineering standards indicated that a public crossing is one that is approached from both directions by public roads and because 400 North was not passable eastward by the public due to a closed and locked gate. UDOT, however, reversed that determination based on the new information from Anderson Geneva and Vineyard and classified the crossing as public. Apparently satisfied with this result, Anderson Geneva asked the Commission to dismiss its petition. In a subsequent letter, however, UDOT reiterated the crossing's public classification but ordered the crossing's temporary closure for safety reasons.

¶4    The parties were unhappy with UDOT's letter for different reasons. Anderson Geneva agreed with the public determination but objected to the temporary closure of the crossing. Union Pacific, on the other hand, agreed that the crossing should be closed but believed that it should be classified as private. Accordingly, Union Pacific filed a petition with the Commission challenging UDOT's public classification. Anderson Geneva, after successfully

moving to intervene,[1] opposed Union Pacific's petition and cross-petitioned to challenge UDOT's decision to temporarily close the crossing.

¶5    The history of the crossing and the land surrounding it was the central focus of the hearing before the Commission on these petitions. Its early history is undisputed. Union Pacific's predecessor acquired by deed a right of way for a rail corridor in 1881. At some point before 1942, a road (400 North) was established crossing that right of way. At the hearing, the parties stipulated that this road and its crossing were public by 1942. Then, in 1942, Utah County passed a resolution quitclaiming all the land located within a 1,500-acre area for the construction of a steel plant, eventually known as Geneva Steel and now owned by Anderson Geneva. As part of this resolution, the County vacated its claim to the portions of 400 North that were contained within the boundaries of the proposed steel plant. The Commission found, on the testimony of four witnesses, that the resolution did not vacate the portions of 400 North west of the track or the crossing of the track itself. Based on this evidence, the Commission determined that the 400 North crossing remained public after the 1942 resolution. Neither party contests that determination.

¶6    The Commission further determined that nothing occurred in the decades following the 1942 resolution that changed the public character of the crossing. None of the parties disputed the fact that no formal vacatur or abandonment proceeding occurred after 1942. And though the Commission found that "at least a portion of the crossing . . . presently lie[s] over the land vacated by the 1942 Resolution," it determined that the crossing remained public despite a possible shift in the road's location. In so finding, the Commission identified evidence supporting two possible explanations for the road's alleged shift.

¶7    First, evidence suggested that the crossing could have been reconfigured in the early 1970s for safety reasons. Specifically, the original crossing angle could have been altered from something less than a 90-degree angle "to something closer to a 90-degree angle to the tracks." But the Commission lacked conclusive evi-

---

[1] The Town of Vineyard also successfully intervened and joins in Anderson Geneva's briefing before this court.

dence of which entities—Union Pacific, Utah County, Geneva Steel, and/or UDOT—were involved in possible discussions about the reconfiguration and of "whether the County was involved in the reconfiguration or whether it was solely reconfigured by the steel plant and [Union Pacific]."

¶8   Second, the Commission postulated that any change in the road's location could have been the result of "the actual shifting of the road" over time. Witnesses testified that "it would not be uncommon for the road to have shifted over 80 years or so." But the Commission noted that it "lack[ed] evidence showing precisely where the road actually was at the time of the 1942 Resolution."

¶9   The possible relocation of the crossing notwithstanding, the lack of any formal attempt to abandon or vacate the crossing convinced the Commission that the crossing remained public. The presence of a locked gate and the absence of actual public use or maintenance were, according to the Commission, thus irrelevant. Further, the Commission determined that the engineering standards that supported UDOT's earlier private classification were no barrier to UDOT's new public classification. Though these standards suggest that a crossing like the 400 North crossing is not public because only one approach to it is public, these standards also recognize exceptions to this general rule.

¶10   Accordingly, because the crossing had never been formally abandoned, because UDOT's own guidelines allow this kind of road to be classified as public, and because numerous public entities and databases had considered and listed the crossing as public for nearly four decades, the Commission found that there was "substantial evidence the crossing is public."

¶11   After losing on its petition before the Commission, Union Pacific filed a request for rehearing, which included a new argument: "UDOT does not have jurisdiction over the crossing . . . because 400 North Street in Vineyard, Utah, is not a public road at the point where it crosses Union Pacific's tracks." This request was denied, however, and Union Pacific sought review in this court of the Commission's decision upholding UDOT's public classification.

II

¶12  Before we consider the merits of this case, we first address the applicable standard of review. The parties[2] offer competing formulations of the governing standard. Union Pacific frames the issue as a jurisdictional question of law. It identifies the question before us as "whether a crossing is private and thus not subject to the jurisdiction of UDOT," and argues that the Commission's determination "that the public right of way moved with the road onto Union Pacific's private right of way" was a "conclusion of law [that] should be" reviewed for correctness. Anderson Geneva, on the other hand, frames the issue as "[w]hether the Commission acted unreasonably in affirming UDOT's classification of the crossing as public" and asserts that this is a mixed question involving the application of law to facts—a question on which the Commission's determination merits deference.

¶13 We see the matter Anderson Geneva's way. As a body "created by and deriv[ing] its powers and duties from statute," UDOT has not only the regulatory powers expressly granted to it, but also those "which are clearly implied as necessary to the discharge of the duties and responsibilities imposed upon it." *Basin Flying Serv. v. Pub. Serv. Comm'n*, 531 P.2d 1303, 1305 (Utah 1975). Under its governing statute, UDOT has "the power to determine and prescribe the manner . . . and the terms of installation, operation, maintenance, use and protection . . . of each crossing of a public road or highway by a railroad or street railroad . . . and to alter or abolish any such crossing, [and] to restrict the use of such crossings." UTAH CODE § 54-4-15(2). Implicit in this grant of authority over public railroad crossings is the authority to decide which crossings are public. In that sense, UDOT has the statutory authority to decide, at least initially, its own jurisdiction; it undoubtedly has the jurisdiction to determine whether it possesses jurisdiction.

¶14  Neither side disputes this. Union Pacific, for instance, never challenged UDOT's jurisdiction by, for example, claiming that

_____

[2] The Commission, UDOT, and Vineyard are all respondents in this case, but only Anderson Geneva submitted responsive briefing. We accordingly refer to Union Pacific and Anderson Geneva as the parties in interest.

it lacked authority to decide which railroad crossings are public. Instead, it argues only that the crossing should have been classified as private and thus not subject to UDOT regulation. This is not really a challenge to UDOT's jurisdiction. It is an argument challenging the propriety of UDOT's *exercise* of jurisdiction (whether UDOT correctly classified the crossing as public). And under the circumstances of this case, the answer to that question turns on the application of the law to the facts—whether a particular crossing that was never formally abandoned but may have moved partially onto private land falls within the definition of a public crossing. The standard of review applicable to mixed questions in the agency context, however, requires some explanation.

¶15 As we recently indicated in *Murray v. Labor Commission*, we review agency determinations of mixed questions under the standard framework established for review of trial court decisions. 2013 UT 38, ¶ 23, __ P.3d __. Under this approach, "our review [of mixed questions] is sometimes deferential and sometimes not." *Manzanares v. Byington* (*In re Adoption of Baby B.*), 2012 UT 35, ¶ 42, __ P.3d __. The level of deference we give an agency determination of a mixed question depends on:

> (1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on facts observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to trial courts.

*Id.* (internal quotation marks omitted). Ultimately, we defer to an agency determination of a mixed question when it is "*not* 'law-like' because it does not lend itself to consistent resolution by a uniform body of appellate precedent," and/or it "*is* 'fact-like' because the [agency] is in a superior position to decide it." *Id.*

¶16 Only if we determine that the mixed question involves a statutory delegation of "discretion" to the agency will we depart from this framework and review the action for "an abuse of discretion." *See Murray*, 2013 UT 38, ¶ 30; *see* UTAH CODE § 63G-4-403(4)(h) (stating that an appellate court shall grant relief if "the

agency action is . . . an abuse of the discretion delegated to the agency by statute"). The abuse of discretion standard, however, extends only to truly discretionary decisions. A discretionary decision involves "a question with a range of 'acceptable' answers, some better than others" from which "the agency . . . is free to choose . . . without regard to what an appellate court thinks is the 'best' answer." *Murray*, 2013 UT 38, ¶ 30. These decisions are often driven by multiple factors that influence what is ultimately an equitable decision. *See Supernova Media, Inc. v. Shannon's Rainbow, LLC*, 2013 UT 7, ¶ 19, 297 P.3d 599. In contrast, discretionary power should not be confused with "an administrative grant to administer a statute," as "all agencies are necessarily granted authority by statute to administer portions of the code." *Murray*, 2013 UT 38, ¶ 29 (internal quotation marks omitted). Though a statute may delegate certain powers and authority to an agency, only a delegation of actual discretion warrants the abuse of discretion standard. *See id.*

¶17 The PSC's determination on review here is not such a discretionary decision. PSC is statutorily vested with "power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility . . . , and to do all things . . . which are necessary or convenient in the exercise of such power and jurisdiction," UTAH CODE § 54-4-1, and with "exclusive jurisdiction [over] the resolution of any dispute" related to the establishment and regulation of grade crossings, *id.* § 54-4-15(4)(a). But these are not grants of discretion. They are grants of authority.

¶18 PSC was tasked with deciding whether the facts presented fit within the bounds of an applicable statute. That question has one correct answer. It does not implicate a choice among a range of many acceptable options, *see Murray*, 2013 UT 38, ¶ 30, or multiple factors that influence an equitable decision, *see Supernova Media*, 2013 UT 7, ¶ 19—hallmarks of a discretionary decision. We accordingly review the PSC's mixed determination under a standard of review dictated by the factors set forth in *In re Adoption of Baby B.*

¶19 Under that formulation, we conclude that the PSC's decision to uphold UDOT's public classification both "*is* fact-like" and is "*not* law-like" and is thus subject to a deferential standard of review. *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 42. "The partic-

ular facts and circumstances" surrounding a crossing's public character, "are likely to be so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out," particularly when changes in that character may have taken place over many years. *Id.* ¶ 43 (internal quotation marks omitted). Moreover, because much of the detail about the crossing's history was contained in witness memories and recollections of past dealings, PSC was in a better position to resolve this issue than we are now. *See id.* (stating that a question is "fact-like" if resolution of it "would often be affected by [a trial judge's] observation of a competing 'witness's appearance and demeanor' on matters 'that cannot be adequately reflected in the record available to appellate courts'" (citation omitted)). In these ways, PSC's determination in this case is much like a determination of negligence in a personal injury suit arising out of an automobile accident—a determination that we identified in *In re Adoption of Baby B.* as typically warranting deferential review. *See id.*

¶20 Conversely, the question in this case is unlike questions that typically receive non-deferential review, such as questions about what qualifies as a reasonable search or seizure. *See id.* ¶ 44. It does not lend itself "to consistent resolution by uniform precedent" and will not create a "consistent rule" upon which "the general public ought to be able to rely." *Id.*

¶21 We must accordingly review PSC's decision with a healthy dose of deference, paying heed to the reasons we afford it such deference.

### III

¶22 Whether the Commission's decision upholding UDOT's public classification can stand turns on the evidence that was before it and the evidence that it would have needed to reverse UDOT's determination. As the party challenging UDOT's public classification before the Commission, Union Pacific bore the burden of persuading the Commission that UDOT's factual determination that the 400 North crossing is public was "not supported by substantial evidence." *Utah Chapter of the Sierra Club v. Bd. of Oil, Gas, & Mining,* 2012 UT 73, ¶ 31, 289 P.3d 558 (internal quotation marks omitted). It could have met that burden by showing either (1) that the 400 North crossing was abandoned/vacated and no longer public; or (2) that 400 North, as it stands today, is a new

road that never became a public right of way. It did neither. Thus, we uphold the Commission's determination that UDOT's public classification is supported by substantial evidence.

A

¶23 The Commission would have had to overturn UDOT's public classification if Union Pacific had shown that the public abandoned its right to use the crossing. Under Utah law, however, once a road becomes public, it remains public until it is *formally* abandoned or vacated. UTAH CODE § 72-5-105(1) ("All public highways, streets, or roads once established shall continue to be highways, streets, or roads until formally abandoned or vacated . . . .").[3] By statute, any such vacatur or abandonment must occur "by written order, resolution, or ordinance resolution of a highway authority having jurisdiction or by court decree." *Id.* This statute "make[s] no allowance for" anything but formal abandonment. *State v. Harvey Real Estate*, 2002 UT 107, ¶ 17, 57 P.3d 1088.

¶24 Having stipulated that the 400 North crossing was or became public in 1942, Union Pacific had the burden of presenting evidence of formal abandonment or vacatur after that date. It failed to carry that burden. The only evidence presented to the Commission on this question established conclusively that neither the 1942 Resolution nor any subsequent formal act abandoned the 400 North crossing. That was fatal to Union Pacific. Having failed to carry its burden of establishing formal abandonment or vacatur, Union Pacific could not succeed in establishing the crossing's non-public nature by demonstrating—as it sought to do—that the crossing was no longer being used consistently by the public.

---

[3] *See Culbertson v. Bd. of Cnty. Comm'rs*, 2001 UT 108, ¶ 42, 44 P.3d 642 ("Section 72-5-105 plainly provides that a public highway remains a highway until the proper authorities order it 'abandoned or vacated.'"), *overruled on other grounds by Madsen v. JPMorgan Chase Bank, N.A.*, 2012 UT 51, 296 P.3d 671 (per curiam); *Clark v. Erekson*, 341 P.2d 424, 426 (Utah 1959) (citing the predecessor to Utah Code section 72-5-105 and stating that a "public highway can only be abandoned by an order of the county commissioners or other competent authority").

B

¶25 Thus, Union Pacific's only viable means of attacking UDOT's public classification is to show that the 400 North crossing, as it stands today, is not the same crossing that has been public since at least 1942. Union Pacific pressed this in its rehearing request to the Commission and advances it again before this court today. Specifically, Union Pacific argues that the crossing as it stands "became private when the road that crosses Union Pacific's right of way near 400 North Street was relocated off of the public right of way in the 1970's."[4] We hold, however, that Union Pacific failed to produce enough evidence to support that theory below. Specifically, we find that significant evidentiary gaps exist regarding (1) whether and how much the road moved since 1942, and (2) what caused the crossing to move and which of the interested entities—if any—were involved in reconfiguring the crossing after it became public.

¶26 First, the evidence presented to the Commission did not conclusively establish that the crossing moved at all—let alone enough to change its character from public to private. As to the exact location of the 1942 crossing, the Commission stated that it

---

[4] Anderson Geneva contends that Union Pacific did not preserve this argument below and so cannot raise it on review. It is true that Union Pacific did not make this argument in its pre-hearing filings or at the hearing itself. Union Pacific did, however, make the argument in its request for rehearing before the Commission. Specifically, it argued that "UDOT does not have jurisdiction over the crossing because 400 North is not a 'public road' at the point where it crosses the railroad tracks" and that 400 North's "current placement . . . determines whether UDOT has jurisdiction over the crossing." This is enough to preserve the issue for review. *See* UTAH CODE § 54-7-15(1), (2)(a)-(b) (stating that parties wishing to challenge the Commission's action must apply for rehearing and that "[a]n applicant may not urge or rely on any ground not set forth in the application in an appeal to any court"). It is of no matter that Union Pacific, in its briefing to this court, cites cases in support of this argument that it has never before cited in this matter. *See Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828 ("[W]e routinely consider new authority relevant to issues that have properly been preserved . . . .").

lacked evidence "showing precisely where the road actually was at the time of the 1942 Resolution" and that "[t]he evidence is also not clear as to the width of the 400 North road remaining after the 1942 resolution." Given these findings, the Commission could not credibly determine that the crossing as it exists is not in the exact position it inhabited in 1942.

¶27  As Union Pacific indicates, the Commission did seem to accept that some movement occurred when it found that "the road and Crossing . . . are either entirely or partly within the land that was vacated" and that the crossing "lie[s] almost completely off the public [right of way]." But Union Pacific had to do more than simply show that the crossing moved. "[T]he public cannot acquire a right by use to pass over a tract of land generally, but only in a certain . . . way," *Lindsay Land & Livestock Co. v. Churnos*, 285 P. 646, 649 (Utah 1929), but Utah law has long allowed changes to a right of way as long as those changes do not diminish its usefulness, frustrate its purposes, or burden the dominant or servient estate,[5] *see Hubble v. Cache Cnty. Drainage Dist. No. 3*, 259 P.2d 893, 896 (Utah 1953) ("[I]t is clear that the needs of society and the concomitant policy of the law favor changes and improvements for the benefit of the dominant estate so long as the manifest intent of the parties does not disallow the changes and the burden to the servient tenement is not increased.").[6] Thus, a public right of way

---

[5] This rule does not apply if the easement is expressly created and its boundaries defined by a document or agreement. *See Wykoff v. Barton*, 646 P.2d 756, 758 (Utah 1982) ("[A] right-of-way founded on a deed or grant is limited to the uses and extent fixed by the instrument."); *see also* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.8 (2000) (excepting from the general rule situations where "the location and dimensions [of a right of way] are determined by [an] instrument or circumstances surrounding [the] creation of [the right of way]"). In this case, however, no document was presented showing the exact location of the crossing when it became public. Indeed, the parties are not even certain when the crossing became public. They simply accept that it was public by 1942.

[6] *See also Richards v. Pines Ranch, Inc.*, 559 P.2d 948, 951 (Utah 1977) ("[O]nce the character of [a prescriptive] easement has been fixed no material change or enlargement of the right acquired can

may be changed or moved as long as its "practical identity" is preserved. *See Lindsay Land & Livestock Co.*, 285 P. at 649 (noting that, for establishment of a public right of way, "slight deviations from the common way to avoid encroachments, obstacles, or obstructions upon the road" are not enough to interrupt the public's use as long as the "practical identity of the road [is] preserved").

¶28 Further, we have held that when the public acquires by use a right of way over private land, it also acquires the right to make "necessary improvements and repairs . . . so as to keep it in a suitable condition." *Jeremy v. Bertagnole*, 116 P.2d 420, 423 (Utah 1941) (internal quotation marks omitted); *Blonquist v. Blonquist*, 516 P.2d 343, 344 (Utah 1973) (stating that a public right of way acquired by use includes not only the "beaten path" but also "that which was reasonably safe and convenient for the use to which the road was put"). Moreover, by statute, the scope of a public right of way "is that which is reasonable and necessary to ensure safe travel according to the facts and circumstances." UTAH CODE § 72-5-104(8); *see Conatser v. Johnson*, 2008 UT 48, ¶ 21, 194 P.3d 897 ("[A]n easement holder has the right to make incidental uses beyond the express easement and does not exceed the easement's scope if those uses are made in a reasonable manner and they do not cause unnecessary injury to the servient owners." (internal quotation marks omitted)). The Commission heard evidence that the crossing may have been reconfigured in the early 1970s for safety reasons. If this reconfiguration actually occurred and consisted only of changes that were necessary for safe travel, the changes would not affect the right of way's public status.

¶29 Because the Commission was not presented with evidence of the 1942 crossing's exact location, it could not determine whether any movement since then was significant enough to change the public character of the crossing or that any changes went beyond those "necessary" to maintain safe travel on the right of way. Thus, the Commission could not conclude that such

---

be made, if thereby a greater burden is placed on the servient estate."); RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.8(3) (2000) ("[T]he owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement . . . to permit normal use or development of the servient estate.").

movement created a new crossing that had to be independently dedicated to public use.

¶30 This failing is compounded by Union Pacific's inability to establish how the road moved and who moved it (assuming that it did move). The Commission postulated that the road either moved over time or was reconfigured in the early 1970s for safety. If it was the former, the Commission could hardly determine that such undirected and incremental changes extinguished a right of way that existed for almost a century. *See Severance v. Patterson*, 370 S.W.3d 705, 724 (Tex. 2012) (discussing a comparable principle from riparian law and stating that an easement defined by water-line is not extinguished by "gradual and nearly imperceptible movement of coastal boundaries"). And if it was the latter, then the Commission could not decide whether the relocation extinguished the public right of way until it knew who participated in or agreed to the change. It is well-settled, after all, that parties with interest in a right of way—the servient and the dominant estate holders—can, by mutual agreement, alter the boundaries of the easement. *Lyman Grazing Ass'n v. Smith*, 473 P.2d 905, 907 (Utah 1970) ("[W]hen an easement has once been established, its location may be changed by an executed oral agreement between the owner of the servient estate and the owner of the dominant estate. . . . The consent of the owner of the servient estate to a change in the location of an easement may be implied from acquiescence." (internal quotation marks omitted)). In this case, the Commission stated that it lacked evidence "to determine whether the County was involved in the reconfiguration or whether it was solely reconfigured by the steel plant and [Union Pacific]." Because the Commission could not rule out the possibility that the County and Union Pacific reached an agreement about the possible 1970s reconfiguration, it could not determine that the reconfiguration extinguished the public nature of the crossing.

¶31 In sum, Union Pacific failed to present enough and the right type of evidence to support its arguments before the Commission. Because Union Pacific did not come forward with evidence showing that the 400 North crossing was formally vacated or abandoned, its only hope was to show that the 400 North crossing was a new crossing that never became public. Evidentiary mysteries about how much the road moved and why and who

moved it, however, were grounds for the Commission to rule against Union Pacific on that question.

_____