**2015 UT App 265**

## THE UTAH COURT OF APPEALS

METROPOLITAN WATER DISTRICT OF SALT LAKE & SANDY,
Appellant,
*v.*
QUESTAR GAS COMPANY,
Appellee.

Opinion
No. 20140050-CA
Filed October 29, 2015

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 120905379

Shawn E. Draney, Rodney R. Parker, Scott H. Martin,
and Dani N. Cepernich, Attorneys for Appellant

Edwin C. Barnes, Perrin R. Love, Shannon K.
Zollinger, Colleen Larkin Bell, and Joseph D. Kesler,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and KATE A. TOOMEY concurred.

ORME, Judge:

¶1     The Metropolitan Water District of Salt Lake & Sandy (the District) appeals from the district court's denial of the District's motion for summary judgment and the dismissal of its claims. We affirm.

BACKGROUND[1]

¶2      The District owns and operates the Salt Lake Aqueduct (the SLA), a water pipeline that delivers water from Deer Creek Reservoir to the Little Cottonwood Water Treatment Plant before carrying the treated water to various storage facilities. The SLA was constructed between 1939 and 1951 as part of the Bureau of Reclamation's (the BOR) Provo River Project. According to the District, the "SLA corridor consists of fee lands, deeded easements, and easements reserved in federal land patents pursuant to the Canal Act of 1890[.]"[2] The portion of the SLA at issue in this case was constructed within a non-exclusive easement reserved by a federal land patent dated May 5, 1898. In 1955, after construction of the SLA, the land encumbered by the SLA was dedicated to Salt Lake County for public use. The relevant part of the SLA lies under the western edge of Westview Drive, a residential street in Salt Lake County.

---

1. "[I]n reviewing a denial of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Utah Dep't of Envtl. Quality v. Redd*, 2002 UT 50, ¶ 3, 48 P.3d 230.

2. The Canal Act of 1890 provides:

> In all patents for lands taken up after August 30, 1890, under any of the land laws of the United States or on entries or claims validated by this Act, west of the one hundredth meridian, it shall be expressed that there is reserved from the lands in said patent described a right of way thereon for ditches or canals constructed by the authority of the United States.

43 U.S.C.A. § 945 (West 2007). Within the United States, the hundredth meridian west of Greenwich runs from the Canada–North Dakota border in the north through Texas in the south.

¶3    Questar Gas Company (Questar) maintains a natural gas pipeline, two inches in diameter, which runs parallel to the SLA on the opposite side—the east side—of Westview Drive. A sewer line and a water line also run between Questar's pipeline and the SLA. Questar's pipeline provides natural gas to the homes along Westview Drive and crosses the SLA in four locations. In 1956, Questar's pipeline was installed pursuant to two gas franchises granted by Salt Lake County in 1928 (the 1928 Franchise Agreements) and construction permits granted in 1956.[3] The 1928 Franchise Agreements authorized Questar to "lay and construct all pipe lines under this franchise in accordance with modern and established practice and in such a manner as not to unreasonably interfere with water pipes which may have been previously laid." Before Questar constructed its pipeline, it also entered into a fifty-year license agreement (the 1956 License Agreement) with the BOR on December 5, 1956. Under the 1956 License Agreement, Questar's pipeline was acknowledged to "not be incompatible with the purposes for which [easements for the SLA] were acquired and are being administered." The 1956 License Agreement expired on December 5, 2006.

¶4    Two months before the 1956 License Agreement expired, the BOR quitclaimed the SLA and the non-exclusive easement to the District. Consequently, when the 1956 License Agreement expired, the District asked Questar to sign a new license agreement for the continued presence of Questar's pipeline within the SLA corridor. The parties negotiated extensively in an effort to formulate the terms of a new license agreement. They were not successful, primarily because of Questar's insistence

---

3. The 1928 Franchise Agreements were granted to Utah Gas and Coke Co., John McFayden, and L.B. Denning. The 1956 construction permits were granted to Mountain Fuel Supply Co. For ease of discussion, we refer to Questar Gas Company and all of its predecessors collectively as Questar.

that it is not subject to the District's regulations by reason of its franchise agreement with Salt Lake County.

¶5     In 2001, Questar had entered into a franchise agreement (the 2001 Franchise Agreement) with Salt Lake County. The 2001 Franchise Agreement authorizes Questar to "construct, maintain and operate in the present and future roads, streets, alleys, highways and other public rights-of-way . . . within County limits a distribution system for furnishing natural and manufactured gas to the County, the County's inhabitants and persons for heating and other purposes." The agreement is silent regarding interference with existing utility lines.

¶6     The District has adopted regulations for non-district use of the SLA. Among other things, the District's regulations provide that utility crossings require a license agreement. In particular, one regulation provides:

> Utility crossings of Aqueduct Corridors require a License Agreement on an individual basis. All applicable state, city, and county regulations shall be adhered to in the construction of utilities. Where utilities will be constructed by or for a developer, but dedicated to a municipality or other local governmental entity or regulated public utility, the District will require the License Agreement to be signed by both the developer and that municipality or other local governmental entity or regulated public utility. Parallel utilities are not allowed within Aqueduct Corridors. Metal pipes which are in close proximity to and may affect District pipelines shall implement corrosion protection measures that provide adequate protection of the District's pipelines.

¶7     In August 2012, the District filed a complaint against Questar. Thereafter, the District filed a motion for summary

judgment seeking a declaratory judgment that, among other things, Questar's pipeline belongs to the District because the 1956 License Agreement expired in 2006, the District has statutory authority to require a licensing agreement for Questar's continued occupancy in the SLA corridor, and Questar's continued presence in the SLA corridor (absent an agreement with the District) amounts to "trespass, interference with waterway, and public nuisance as a matter of law."

¶8     The district court denied the District's motion and issued a memorandum decision. Noting that the District and Questar "have had their respective pipelines in the easement for more than sixty years without any problems or interference with each other and there is no issue of interference at this time," the district court concluded that Questar's pipeline did not "constitute an unreasonable interference on the SLA." The court also concluded that "nothing contained in the statutes nor [the District]'s regulations, grant [the District] unilateral authority to modify or interfere with [Salt Lake] County's right to grant a franchise to Questar, or to claim ownership of Questar's Pipelines." Finally, the court concluded that the District "is the holder of a non-exclusive easement, and Questar Gas maintains its Pipelines pursuant to permits approved by Salt Lake County." Accordingly, the court could "find no trespass, public nuisance, nor interference as a matter of law."

¶9     On December 17, 2013, the district court issued a notice of inquiry, asking whether "this matter can be dismissed in view of its memorandum decision." In response, Questar filed a request for dismissal along with a proposed order of dismissal without prejudice, which the District opposed. About two weeks later, the district court signed the proposed order of dismissal, thereby dismissing, without prejudice, the District's claims in their entirety. The court concluded:

> [W]ith respect to the easements at issue: (1) [the District] is the holder of a non-exclusive easement

in the [SLA]; (2) Questar maintains its gas pipelines in the SLA pursuant to permits approved by the fee owner of Westview Drive and other public roads at issue in this case, Salt Lake County; (3) the 1956 License Agreement . . . is expired, and nothing contained in the Utah Code, or [the District]'s regulations, grant [the District] unilateral authority to modify or interfere with Salt Lake County's right to grant a franchise to Questar, or for [the District] to claim ownership of Questar's pipelines; (4) as such, [the District] and Questar must exercise their rights so as not to unreasonably interfere with the other, and only in the event of an irreconcilable conflict are Questar's rights subservient to [the District], as [the District]'s easement is first in time; and (5) the parties have had their respective pipelines in the SLA for more than sixty years without interference with each other and there is no issue of interference to be adjudicated at this time.

¶10     The District appeals.


ISSUES AND STANDARDS OF REVIEW

¶11     First, the District contends that the district court erred "in holding that Questar need not comply with [the District's] regulations because [Questar's] franchise from Salt Lake County allows it to install gas pipelines under dedicated roadways, and [the District] lacks 'unilateral authority to modify or interfere with the County's right to grant a franchise to Questar.'" Second, the District contends that even if its regulations are not applicable to Questar, the district court erred "in failing to conclude as a matter of law that the unlicensed presence of [Questar's] high-pressure gas pipeline in the SLA corridor easement is an unreasonable burden on the easement."

¶12 "Summary judgment is appropriate where (1) there is no genuine issue as to any material fact and (2) the moving party is entitled to a judgment as a matter of law." *Hillcrest Inv. Co. v. Utah Dep't of Transp.*, 2012 UT App 256, ¶ 11, 287 P.3d 427 (citation and internal quotation marks omitted). "A district court's ruling on either a motion to dismiss or a motion for summary judgment is a legal question which we review for correctness[.]" *Commonwealth Prop. Advocates, LLC v. MERS, Inc.*, 2011 UT App 232, ¶ 6, 263 P.3d 397. *See also Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 ("An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.") (citations and internal quotation marks omitted); *Rushton v. Salt Lake County*, 1999 UT 36, ¶ 17, 977 P.2d 1201 ("The proper interpretation of a statute is a question of law. Therefore, when reviewing an order of dismissal involving the interpretation of a statute, we accord no deference to the legal conclusions of the district court but review them for correctness.") (internal citation omitted).

## ANALYSIS

### I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE DISTRICT DOES NOT HAVE STATUTORY AUTHORITY TO REGULATE PUBLIC UTILITIES, INCLUDING QUESTAR.

¶13 The District argues that the district court erroneously failed "to recognize [the District]'s statutory right, as a Utah local district, to promulgate regulations that protect critical infrastructure."[4] The District contends that it has both express

---

4. Section 17B-1-103 of the Utah Code describes a local district as "(i) a body corporate and politic with perpetual succession; (ii) a quasi-municipal corporation; and (iii) a political subdivision of

(continued…)

and implied statutory authority to regulate Questar and other public utilities within the SLA.

¶14 Specifically, the District argues that it has an "express statutory grant of regulatory authority" under Utah Code section 17B-1-301, which states that the board of trustees for a local district may "adopt and enforce rules and regulations for the orderly operation of the local district or for carrying out the district's purposes." Utah Code Ann. § 17B-1-301(2)(i) (LexisNexis Supp. 2014). The District also relies on *Union Pacific Railroad v. Utah Department of Transportation*, 2013 UT 39, 310 P.3d 1204, for the proposition that its regulatory powers include "not only the regulatory powers expressly granted to it, but also those 'which are clearly implied as necessary to the discharge of the duties and responsibilities imposed upon it.'" *Id.* ¶ 13 (quoting *Basin Flying Serv. v. Public Serv. Comm'n*, 531 P.2d 1303, 1305 (Utah 1975)). Therefore, the District argues, it also has the "implied authority necessary to discharge its responsibility to protect the SLA."

¶15 The District notes that under this statutory grant of authority to adopt regulations, its board of trustees promulgated "Regulations for Non-District Use of Salt Lake Aqueduct and Point of the Mountain Aqueduct Corridors" to "define the parameters of public use and occupancy of [the District]'s fee and easement lands, and . . . to protect the public's property rights, water infrastructure, and [the District]'s operations." The District further observes that its primary purpose as an entity is "to secure water rights and distribution facilities to ensure adequate water supplies for the Salt Lake Valley now and for the future." Thus, the District asserts, "[i]t is inconceivable that [its] statutory authority [under Utah Code section 17B-1-301(2)(i)]

---

(…continued)
the state." Utah Code Ann. § 17B-1-103(1)(a) (LexisNexis Supp. 2014).

does not include the implied authority to regulate activities within the SLA corridor that may interfere with [its] core purpose." We disagree.

¶16 To begin with, nothing in section 17B-1-301 of the Utah Code provides express authority for the District (or any local district) to regulate a public utility, including Questar. *See* Utah Code Ann. § 17B-1-301. Although the District's board of trustees may "adopt and enforce rules and regulations for the orderly operation of the [District] or for carrying out [its] purposes," *see id.* § 17B-1-301(2)(i), the kind of regulatory authority the District wishes to assert is not the kind of regulatory authority intended by the statute. Nothing in section 17B-1-301 expressly authorizes regulation of public utilities, a matter entrusted rather comprehensively to the Utah Public Service Commission. *See id*. § 54-4-1 (2010) (giving the commission power to "regulate every public utility in this state").

¶17 The District also relies on its enumerated powers under section 17B-1-103 of the Utah Code for its alleged express authority to regulate public utilities. *See id.* § 17B-1-103 (Supp. 2014). Among other things, section 17B-1-103 generally empowers all local districts to "acquire or construct works, facilities, and improvements necessary or convenient to the full exercise of the district's powers, and operate, control, maintain, and use those works, facilities, and improvements," *id.* § 17B-1-103(2)(d); to "perform any act or exercise any power reasonably necessary for the efficient operation of the local district in carrying out its purposes," *id.* § 17B-1-103(2)(q); and to agree with another political subdivision of the state or a public or private owner of property to allow use of property "owned by the district" or "on which the district has a right-of-way" "upon the terms and for the consideration . . . that the district's board of trustees considers to be in the best interests of the district and the public," *id.* § 17B-1-103(2)(t). As with section 17B-1-301, nothing

in section 17B-1-103 expressly authorizes the District to regulate Questar or any other public utility within the SLA or elsewhere.[5]

¶18    We gather that if the Legislature had intended to empower local districts to regulate public utilities, it could have easily provided an express grant of authority within either section 17B-1-103 or 17B-1-301 of the Code. *See Standard Fed. Sav. & Loan Ass'n v. Kirkbride*, 821 P.2d 1136, 1138 (Utah 1991) ("If that is what the legislature intended to accomplish, it certainly knows how to do so."). Indeed, the Legislature has provided other

---

5. Nor, oddly enough, can the District regulate the possession of knives within its boundaries. *See* Utah Code Ann. § 17B-1-103(6)(a) (LexisNexis Supp. 2014). That section specifically reserves to the State the right to regulate knives and specifically prohibits a local district from adopting or enforcing regulations or rules pertaining to knives. *See id.* § 17B-1-103(6)(b)–(c). According to Senator Christensen, who introduced the bill in the Senate,

> [s]everal locations and communities within the state have decided that, or tried to decide that, it was not legal to have weapons, specifically guns, so that you could [not] carry them. We've overcome that by passing statewide laws that are, makes it legal to carry now that you know where you can [and] where you can't. We've run into a problem now with people carrying knives and communities trying to outlaw the carrying of a knife, considering it a weapon. Therefore, and it's been becoming a problem, we would like to pass that, with the same protections, Second Amendment rights, to knives as there are to guns.

Senate Floor Debates, H.B. 271, 59th Leg., Gen. Sess. (Utah Feb. 28, 2011) (statement of Sen. Allen M. Christensen), http://utah legislature.granicus.com/mediaplayer.php?clip_id=8874&meta_i d=429993.

governmental entities with the express authority to regulate public utilities. For example, the Utah Department of Transportation (UDOT) has express statutory authority to "make rules for the installation, construction, maintenance, repair, renewal, system upgrade, and relocation of all utilities."[6] Utah Code Ann. § 72-6-116(2)(a) (LexisNexis Supp. 2014). More broadly, the Public Service Commission has express authority to "regulate every public utility in this state." *See id.* § 54-4-1 (2010). The District has no comparable grant of express authority, and these provisions demonstrate that the Legislature has committed the regulation of public utilities to governmental entities other than local districts.

¶19 Nevertheless, relying on *Union Pacific Railroad v. Utah Department of Transportation*, 2013 UT 39, 310 P.3d 1204, the District argues that it has the implied power to regulate Questar's and other public utilities' pipe and cable installations within the SLA corridor. *See id.* ¶ 13 ("As a body created by and deriv[ing] its powers and duties from statute, UDOT has not only the regulatory powers expressly granted to it, but also those which are clearly implied as necessary to the discharge of the duties and responsibilities imposed upon it.") (alteration in original) (citation and internal quotation marks omitted). We do not see how the ability to regulate Questar and other public utilities within the SLA corridor is necessary to the District's ability to carry out its duties and responsibilities. In simplest terms, we fail to see how the District cannot "secure water rights and distribution facilities to ensure adequate water supplies for the Salt Lake Valley now and for the future" simply because Questar has a pipeline on the opposite side of Westview Drive,

---

6. "'Utility' includes telecommunication, *gas*, electricity, cable television, *water*, sewer, data, and video transmission lines, drainage and irrigation facilities, and other similar utilities whether public, private, or cooperatively owned." Utah Code Ann. § 72-6-116(1)(b) (LexisNexis Supp. 2014) (emphases added).

even if the pipeline crosses the SLA in four locations. The District has been, and is currently, fulfilling its intended purpose despite the presence of Questar's pipeline (and other utility lines) beneath Westview Drive. And as the district court noted, there has never been a problem posed by the proximity of the SLA and Questar's pipeline.

¶20    The District further asserts that "[t]he regulatory authority [it] is exercising over the SLA corridor is the same authority that is exercised by all manner of governmental entities," including the BOR, UDOT, and Sandy City. The District notes that "before the Bureau of Reclamation transferred the SLA corridor to [the District] in 2006, it also exercised regulatory authority within the corridor" and that Questar "was required to comply with that regulatory authority, and enter into the 1956 License Agreement, before it was allowed to install its gas pipeline within the corridor."

¶21    However, the BOR, through the Secretary of the Interior, has express statutory authority to grant leases and licenses in certain federal lands. *See* 43 U.S.C.A. § 387(b) (West 2007). The District's board of trustees has no such comparable authority under Utah Code section 17B-1-301. But more importantly, when the BOR quitclaimed the SLA to the District, it explicitly did so subject to "valid permits, licenses, leases, rights-of-use, or rights-of-way of record or outstanding on, over, or across the Real Property in existence on the date of this Quitclaim Deed," which would include Salt Lake County's franchise grant to Questar. Thus, the District took the SLA corridor subject to Salt Lake County's franchise grant to Questar.

¶22    The District also compares itself to UDOT, which "has comprehensive regulations of utility and telecommunication use of highway rights-of-way." The District notes that "[u]nder these regulations, utilities are required to obtain an encroachment permit from UDOT for the installation and maintenance of utility facilities in the right-of-way." However, as previously

discussed, *see supra* ¶ 18, UDOT has express statutory authority to regulate and relocate utilities in its rights-of-way. *See* Utah Code Ann. § 72-6-116(2)(a) (LexisNexis Supp. 2014). Again, the District has no comparable express authority.

¶23    Next, the District compares itself, by implication, to Sandy City and Salt Lake County, its two member entities. However, under section 72-7-102 of the Utah Code, "[a] highway authority having jurisdiction over the right-of-way may allow excavating, installation of utilities and other facilities or access *under rules made by the highway authority*[.]" *Id.* § 72-7-102(3)(a) (emphasis added). "The rules may require a permit for any excavation or installation[.]" *Id.* § 72-7-102(3)(b)(i). "'Highway authority' means [UDOT] or the legislative, executive, or governing body of a county or municipality." *Id.* § 72-1-102(8) (2009). Taken together, these provisions expressly authorize Sandy City and Salt Lake County, as well as UDOT, to regulate utilities in the streets and to require permits.

¶24    In this case, the highway authority with jurisdiction over the portion of the SLA under Westview Drive is Salt Lake County. As it is entitled to do, Salt Lake County has enacted rules governing excavation and the installation of utilities within its roadways. *See, e.g.*, Salt Lake County, Utah, Code of Ordinances § 14.16.010, https://www.municode.com/library/ut/salt_lake_county/codes/code_of_ordinances (last visited October 6, 2015).[7]

¶25    Far from possessing the same regulatory authority as UDOT, Salt Lake County, or Sandy City, the District is, in fact, subject to their rules and regulations governing roads. As a local district in Utah, the District may use the roads, and it has the

---

7. Sandy City has done likewise. *See* Sandy City Ordinance no. 10-36, § 13-1-2, http://sandy.utah.gov/fileadmin/downloads/pw/Ordinance10-36.pdf (last visited Oct. 6, 2015).

express authority to "construct and maintain works and establish and maintain facilities . . . across or along any public street or highway." Utah Code Ann. § 17B-1-103(p)(i) (LexisNexis Supp. 2014). However, the District's authority is not without limitation. Particularly, the District—like Questar— must

> *comply with the reasonable rules and regulations of the governmental entity*, whether state, county, or municipal, *with jurisdiction over the street or highway*, concerning:
>
> > (i) an excavation and the refilling of an excavation;
> >
> > (ii) the relaying of pavement; and
> >
> > (iii) the protection of the public during a construction period . . . .

*Id.* § 17B-1-103(3)(a) (emphasis added). The District enjoys no statutory authority to regulate public utilities comparable to the express statutory authority of UDOT, Salt Lake County, and Sandy City.

¶26　Moreover, unlike the District, Salt Lake County has the express authority to grant franchises in its roads.

> A county may grant franchises along and over the public roads and highways for all lawful purposes, upon such terms, conditions, and restrictions as in the judgment of the county legislative body are necessary and proper, to be exercised in such manner as to present the least possible obstruction and inconvenience to the traveling public.

*Id.* § 17-50-306(1) (2013). In this case, the district court concluded that "nothing contained in the Utah Code, or [the District]'s

regulations, grant[s the District] unilateral authority to modify or interfere with Salt Lake County's right to grant a franchise to Questar[.]" We agree. Salt Lake County has the express authority to grant franchises and the District may not interfere with that authority. Accordingly, the District's argument that "[t]he regulatory authority [it] is exercising over the SLA corridor is the same authority that is exercised by all manner of governmental entities," such as the BOR, UDOT, Sandy City, and Salt Lake County, is without merit.

¶27   In addition, having multiple public utilities within one easement is undoubtedly in the public interest. Indeed, the Utah Supreme Court has previously "enunciated the public policy of this State in regard to the multiple uses of the public streets." *Pickett v. California Pac. Utils.*, 619 P.2d 325, 327 (Utah 1980).

> Public welfare demands that the people be served with water, sewer systems, electricity, gas, telephone and telegraph, as well as transportation and means of travel. These services are vital to the well-being of our various communities. It would be almost impossible to meet these urgent requirements without making use of the public property. The presence of the utility facilities on the streets constitutes a use in the public interest subject to public regulation, and an object within the purview of a public policy to be established by the legislature.

*State Road Comm'n v. Utah Power & Light Co.*, 353 P.2d 171, 175–76 (Utah 1960). *Accord Pickett*, 619 P.2d at 327. It is clear that Questar's gas pipeline is vital to the well-being of those citizens living along Westview Drive and that its pipeline is otherwise in the public interest.

¶28   In conclusion, because the District has neither express nor implied authority to regulate Questar, or other public utilities, its

rights against Questar are purely those which it has under property law as the owner of an easement. Thus, we now turn our attention to the District's fallback position that "Questar's continued presence in the easement without an agreement constitutes an unlawful interference with [the District]'s use and enjoyment of the easement."

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT QUESTAR'S PIPELINE DOES NOT UNREASONABLY INTERFERE WITH THE SLA.

¶29    The District argues that "[t]he district court erred in deciding as a matter of law that the presence of the gas pipeline in the SLA easement is not an unreasonable interference with the easement." While acknowledging that the SLA still "is in good condition," the District nevertheless argues that it is "making preliminary preparations for major SLA rehabilitation and replacement work in the next several decades." The District also asserts that "[m]eanwhile, as the SLA ages, gaskets between joints are subject to deterioration, and the chances of leakage will increase." According to the District, the size of the equipment and the depth of the excavations involved in an emergency repair would "typically be very large." Finally, the District claims that an "unreasonable burden was clearly established" because the "presence of a high-pressure gas line crossing above the SLA and through the easement is an obvious burden on the easement."

¶30    "Utah adheres to the rule that the owners of the dominant and servient estates 'must exercise [their] rights so as not unreasonably to interfere with the other.'" *United States v. Garfield County*, 122 F. Supp. 2d 1201, 1242 (D. Utah 2000) (alteration in original) (quoting *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 158 (Utah 1946)). *See also* Restatement (Third) of Prop.: Servitudes § 4.9 (Am. Law Inst. 2000) ("[T]he holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with

enjoyment of the servitude."). "In the event of irreconcilable conflicts in use, priority of use rights is determined by priority in time, except as a later-created servitude takes free of another under the applicable recording act." Restatement (Third) of Prop.: Servitudes § 4.12.

¶31    In its memorandum decision, the district court observed that "[t]he parties have had their respective pipelines in the easement for more than sixty years without any problems or interference with each other and there is no issue of interference at this time, despite an assertion from [the District] that there may be in twenty or thirty years in the future." The district court therefore concluded that Questar's pipeline does not "constitute an unreasonable interference on the SLA" as a matter of law. We agree. Nothing in the record establishes that Questar's pipeline unreasonably interferes or is inconsistent with the District's non-exclusive easement. Both the District and Questar have always been able to, and continue to, effectively operate their respective pipelines within the SLA corridor despite each other's presence.

¶32    The District has conceded that it has no present plans to do any work in Westview Drive; "it only has 'preliminary plans' for replacement work sometime in the next several decades." As such, the District has no way of knowing with certainty what repairs and rehabilitation work, if any, will be undertaken in the future, nor what the scope and nature of those potential construction projects will be. Moreover, any suggestion that Questar would not accommodate the District's rehabilitation work when acquainted with the District's plans is entirely speculative and, Questar insists, inconsistent with the practice of the parties. Furthermore, the District's alleged difficulty in fixing the SLA, if repairs become necessary, is not purely the result of Questar's pipeline within the SLA. The District's easement is also encumbered by a sewer line and a water line that run between Questar's pipeline and the SLA, as well as "asphalt, curb and gutter, landscaping, driveways, garages, . . . homes, [and] the parking lot of two commercial buildings." And even in

the absence of Questar's pipeline, the District is ultimately subject to Salt Lake County's rules and regulations when excavating and refilling the portion of the SLA under Westview Drive. *See* Utah Code Ann. § 17B-1-103(3)(a) (LexisNexis Supp. 2014). As it stands, the District simply cannot know what requirements Salt Lake County will impose on any future SLA repairs and how those requirements will implicate the nearby pipeline owned by Questar—it can only speculate.

¶33    The District argues—and the emphasis is the District's—that *North Union Canal Co. v. Newell*, 550 P.2d 178 (Utah 1976), stands for the proposition that "[i]mprovements that render the easement holder's future use of its easement more difficult or costly constitute *present* interference with the easement." This contention is without merit. *See generally* Restatement (Third) of Prop.: Servitudes § 4.9 cmt. c ("Whether the improvement is an unreasonable interference with the servitude depends on the character of the improvement and the likelihood that it will make future development of the easement difficult.").

¶34    In *Newell*, the plaintiff, North Union Canal Company, had an easement to "use, maintain, clean and repair [the North Union Canal], including access to do so along its banks." 550 P.2d at 179. The canal had been in continuous operation for over seventy-five years. *Id.* The defendants, the Newells, owned a residence on the east side of the canal and had "recently installed a five-foot high chain link fence along its west bank." *Id.* The Canal Company argued that the fence prevented it from the use and enjoyment of its easement along the width of the defendants' property. *Id.* The Newells argued that because there were gates at the north and south ends of their property, the Canal Company still had access to the canal. *See id.*

¶35    The Utah Supreme Court observed that the Canal Company had an established easement and that "when the canal does need such attention, it would be necessary to have access to it through the defendants' property, in which event the fence as

presently constructed would interfere with the plaintiff's use and enjoyment of its easement." *Id.* The Court noted that while the logical conclusion seemed to be "that the fence should be removed," "the object to be desired is to find some accommodation of those conflicting interests, to the maximum advantage and to the minimum disadvantage, of both parties." *Id.* at 179–80.

¶36 The Court further observed that requiring the defendants to remove the fence entirely "would obviously involve the loss of certain practical values" such as "the safeguarding of children and others from getting into the canal; and also esthetic values in improving the appearance of the property and the manner in which the easement area is kept." *Id.* at 180. Thus, the Court ultimately concluded that although it would "require some maturity of attitude and cooperation between the parties," the "better solution . . . would be for the court to exercise its equitable powers and provide a more just and practical solution" that would "permit the fence to remain." *Id.* The Court recommended that the Newells maintain their gates at the northern and southern ends of their property, install additional gates at reasonable intervals in the fence, and provide keys to the Canal Company if the Newells desired locks on the gates. *See id.* The Court remanded to the district court so that the Newells could choose "to either remove the fence, or accept and abide by a decree modified as suggested herein." *Id.* at 180–81.

¶37 We first note that, unlike in *Newell*, Questar has made no recent improvement that renders the District's future use of its easement more difficult or costly. In *Newell*, the defendants had recently installed a five-foot fence. *Id.* at 179. In this case, however, Questar's pipeline and the SLA have peacefully coexisted underground for more than sixty years, and we decline to conclude that Questar's pipeline has suddenly become an unreasonable interference as a matter of law simply because Questar refuses to sign a license agreement with the District.

¶38     Additionally, even if there were evidence of an unreasonable interference on the near horizon, under *Newell*, the solution would not necessarily be for Questar to remove its pipeline from the easement—the result the District seeks. Rather, the "better solution" would be to permit Questar's pipeline to remain and for the parties to cooperate with one another as they have apparently done in the past. *See id.* at 180. In the district court, Questar presented several affidavits, which stand unrebutted, establishing that it "routinely shuts down or reroutes gas lines at its own expense to accommodate construction or repairs of other utility facilities" and that it previously coordinated with the District when the District constructed the Point of the Mountain Aqueduct (POMA) in the streets of Sandy and Draper. In that instance, Questar facilitated the District's construction of POMA by relocating, temporarily protecting, or temporarily shutting down its gas pipelines, which involved rerouting or shutting down twenty-eight service lines in one street alone. Cooperation of this nature would be the better solution for the parties, as and when the District decides it needs to upgrade the SLA or if some emergency circumstance arises in the roadway easement requiring prompt remedial action.

¶39     Moreover, requiring Questar to remove its pipeline from the SLA corridor "would obviously involve the loss of certain practical values." *See id.* As previously discussed, the Utah Supreme Court has determined that "[t]he presence of . . . utility facilities on the streets constitutes a use in the public interest." *Pickett v. California Pac. Utils.*, 619 P.2d 325, 327 (Utah 1980) (citation and internal quotation marks omitted). Here, as it is entitled to do under section 17-50-306 of the Utah Code, Salt Lake County granted a franchise to Questar to "construct, maintain and operate in the present and future roads, streets, alleys, highways and other public rights-of-way . . . within County limits a distribution system for furnishing natural and manufactured gas to the County, the County's inhabitants and persons for heating and other purposes." Questar's pipeline

provides natural gas to the homes along Westview Drive and is undoubtedly "vital to the well-being" of Westview Drive's residents. *See Pickett*, 619 P.2d at 327 (citation and internal quotation marks omitted). Thus, removing Questar's pipeline from the SLA corridor would be detrimental to the public interest, as well as wholly impractical.

¶40 Under the present facts, there is no indication that Questar's pipeline unreasonably interferes with the SLA—the pipelines have peacefully coexisted for more than six decades, and they more or less burden each other equally. The District's claim that Questar's pipeline will interfere with its future construction plans is purely speculative at this time, and we will not reverse the judgment of the district court on the basis of what *might* happen if the District's contemplated repairs do in fact occur or if emergency repairs are in fact required. *See City of Pasadena v. California–Michigan Land & Water Co.*, 110 P.2d 983, 987 (Cal. 1941) ("It would not be right at this time . . . to furnish [relief] for a state of affairs which may never arise, or which may not arise until some remote period.") (omission in original) (internal quotation marks omitted).

CONCLUSION

¶41 The district court correctly concluded that the District lacks either express or implied statutory authority to regulate Questar and other public utilities within the SLA corridor or elsewhere. The court also correctly concluded that there is no issue of interference at present and that Questar's pipeline does not constitute an unreasonable interference on the SLA. Accordingly, we affirm the denial of the District's motion for summary judgment and the dismissal of its claims.

―――――――――