**2023 UT App 110**

# THE UTAH COURT OF APPEALS

C-B-K RANCH LLC,
Appellant,

*v.*

GLENNA R. THOMAS TRUST AND GLENNA R. THOMAS,
Appellees.

Opinion
No. 20210584-CA
Filed September 21, 2023

Seventh District Court, Moab Department
The Honorable Don Torgerson
No. 200700014

Stephen J. Stocks, Attorney for Appellant

Craig C. Halls, Attorney for Appellees

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 This is a dispute over the scope of an easement. C-B-K Ranch LLC (C-B-K) and the Glenna R. Thomas Trust (the Trust) own adjoining parcels of land. C-B-K holds an access easement over a roadway crossing the Trust's property, which C-B-K must use to reach its property. The gate on the roadway sometimes malfunctions, and C-B-K brought suit seeking to replace it with an electric gate. The Trust opposed this request, arguing that the proposed gate would be less convenient for the Trust's uses, would invite trespassers, and would likely be unreliable. After a bench trial, the district court found that replacing the gate with an electric one would place an unreasonable burden on the Trust's estate. Because we determine that the district court did not apply the correct legal standard in reaching that conclusion, we reverse

and remand the matter with instructions for the court to reconsider the issue applying the correct legal standard.

BACKGROUND

¶2     C-B-K and the Trust own neighboring properties in the La Sal Mountains in Grand County, Utah. For nearly forty years, C-B-K has used a roadway traversing the Trust's property to access its own property. This roadway continues across C-B-K's property. On the portion of the road that runs over the Trust's property, there is a large, metal swing gate. The gate is secured by a chain, which is divided into multiple sections such that it can be removed by unlocking either a combination lock belonging to C-B-K or a combination lock belonging to the Trust.

¶3     The gate is now defective. Sometimes the end attached to a post gets out of position, causing the end not attached to the post to drag on the ground. When that happens, a person wanting to open the gate must lift the swinging end off the ground and carry it. Due to his age and health, C-B-K's acting manager (Manager) has difficulty opening the gate when it malfunctions.

¶4     C-B-K brought suit, alleging that it has an easement over the roadway and that it is "entitled to a prescriptive easement . . . for the construction, installation, use and maintenance of an [electric] gate at [its] own expense." The Trust responded, insisting that C-B-K's use of the roadway over the Trust's property was permissive and did not "bloom[] into a prescriptive easement," and it "further denie[d] that there is such a thing as an easement for an electric gate."

¶5     Before trial, however, the parties stipulated that each had an access easement across the other's property. The district court, in a subsequent order, stated, "[P]ursuant to the [s]tipulation of the parties[,] . . . C-B-K Ranch, the dominant estate, is granted a non-commercial easement on the existing road for ingress and

egress, . . . [s]aid easement being a roadway surface," and "[the Trust] is granted an easement which . . . proceeds across the C-B-K property," also "a non-commercial easement for ingress and egress, which is a roadway surface."[1]

¶6    The district court held a bench trial on the remaining issue of whether C-B-K was entitled to replace the existing gate with an electric one. Witnesses for C-B-K included Manager and his friend (Friend), who had visited C-B-K's property hundreds of times over several decades. Witnesses for the Trust included the son (Son) and daughter (Daughter) of Glenna R. Thomas, the trustee of the Trust.

¶7    Manager testified that the current gate was installed by Thomas's second husband. Son recounted that it was installed in the early 1990s and that there had previously been a locked barbed wire gate at its location. Daughter said that since the current gate's installation, it has "always had" a chain with multiple combination locks on it. As to who maintains the gate, Manager declared, "Nobody has maintained it, other than everybody that" has had to repair it when it malfunctions.

¶8    Manager described the access to the gate and problems he has experienced with the gate: "[Y]ou park[] on the county road and walk up a steep little bank[.] I can usually stumble up there and get up there all right. And then you open the gate and come back, drive through, get out and close the gate and drive on." He indicated that "sometimes the gate will swing, but usually, you have to pick it up . . . and [kind of] carry it around." Friend explained that "because [of] the way they hung the hinges, it has a tendency to fall down and drag [on] the ground on the end

---

1. C-B-K brought other claims as well, and the Trust brought several counterclaims, one of which alleged a prescriptive easement over C-B-K's property. Because these additional claims are not at issue in this appeal, we do not address them.

where you unlock it." When this happens, he said, "[y]ou have to pick up the end of it and carry it around[,] and if it goes too far, then the way the hinges are bent and hanging down, you have a real hard time picking it up to clear the ground" because "the hinges keep it in a bind when you're trying to open it." Friend recounted how he had adjusted the gate multiple times "[w]ith a hammer . . . [a]nd wrenches, releasing the bolts so that [he could] beat it back around where it belongs and then tighten the bolts again."

¶9      Daughter and Son agreed that the gate sometimes drags, and they attributed this malfunction to the effects of moisture during winter. Daughter stated that "on a wet year, after the snow[,] . . . the gate will lean a little bit." Son testified that the gate did not drag after the most recent winter "because [of a] lack of moisture" and that, accordingly, the gate had last been repaired by Daughter the previous summer. The court admitted two videos the Trust submitted showing the gate swinging freely, including one in which the following editorial comments can be heard: "So there you go, kids. I don't know who can't open that gate, but I guess if you can't open the gate, don't go [up] the mountain."

¶10     When asked how hard it is for him to pick up the gate when it drags, Manager responded, "[I]t's getting harder and harder. . . . I can still get it done[.] [I]t takes awhile[,] but yeah, I'm going downhill[.] I'm 87 years old and figure . . . I won't even be able to open it at all by next year, probably." Manager explained why he wanted to replace the gate:

> [The] number one [reason] . . . is my age and health problems; number two is it's just so much handier to push a button, the gate opens, you drive through it and go on. And after a minute it will automatically close. . . . And it's a much, much prettier gate.

¶11 Manager referred to an electric gate with a solar panel that he and his son had built and installed on his land, and he explained that he wanted to build and install the same type of gate to replace the existing one on the easement. He said that if he installed the proposed gate, he would give the Trust "at least four" remote-controlled "clickers" that would allow users to open the gate without exiting their vehicles and he would also furnish a keypad that would allow guests to punch in a combination to open the gate, though they would "have to get out of their car[s] to do that." He further noted that the gate would close automatically and then lock automatically. He pledged to pay all costs associated with building, installing, and maintaining the gate. He also stated that the proposed gate would not take up more space than the existing one and that there would be no time when the Trust could not access its property during installation.

¶12 As to the possibility of the electronics of the gate malfunctioning, Manager stated,

> [E]verything . . . mechanically or electric can break down[.] [W]e . . . are not having any problem with [the gate on our property], but if they do have a problem . . . , then you merely use two keys, which I will furnish the [Trust,] and you open the . . . cylinder that pushes the gate open and closed and [unlock] the locks on the gate and then it swings freely.

Manager indicated that he would also furnish the Trust with at least four sets of the keys necessary for the manual override. He also said that he would like to, if the Trust is "agreeable," "bury a little plastic can there with a set of keys" in it so that the keys would be available if the manual override were necessary and the user did not bring a set of keys.

¶13 When asked about any issues he had encountered with his electric gate, Manager candidly recounted that he had

experienced "a lot of problems" with it when he and his son "originally installed it," due to changes in temperature moving the post it hangs on, but he averred that they found a way to "solve[] the problem." He testified that the electric gate now works "very fine." And he indicated that an electric gate is "an advancement in technology."

¶14 Daughter and Son explained some of the concerns the Trust has with an electric gate. First, Son spoke about his experiences with an electric gate on a property he owned in Arizona. He said that "it would work about a third of the time," even though the solar panel was "in the sun all the time," and he agreed that this experience made him concerned about the reliability of the electric gate Manager was proposing.

¶15 Son and Daughter also conveyed that the Trust is especially worried that the proposed gate would be less secure than the existing gate. Son expressed concern with the aesthetic of the gate, indicating that "the fancier things are," the more likely the public—who has access to the gate as it abuts a county-maintained road—will think that the property owner has things worth hiding. He and Daughter relayed that the Trust had previously experienced issues with people removing signs warning against trespassing and also "jimmy[ing] the gate to get in" to the property. Daughter shared her worry that people would steal the gate's solar panel or disassemble the electric gate and access the property. Son called the "security issue" a "huge deal" and conveyed his feeling that having three ways to get through the proposed gate (via "clickers," a keypad, or physical keys) would be less secure than the current system. And Daughter testified that the use of the chain and locks had "always" "been successful" and that she does not have "the same faith" in the proposed gate. She further stated that "the thought of burying a key by the gate scares [her]." On cross-examination, though, Daughter and Son acknowledged that with the current gate there

is a risk that someone could climb over the gate or cut the lock and drive a car through the gate.

¶16 The Trust proffered the testimony of another family member indicating (1) that she has horse equipment and sometimes horses on the property and "the system that is in place right now has protected those things" and (2) that "she worries about emergency circumstances" like a fire and "believes that it's much, much more likely to be able to be taken care of with the current system than with an [electric] gate."

¶17 Daughter and Son also indicated that the proposed gate's electronic lock system would be less convenient for the Trust than the current system involving dual combination locks and would make controlling visitor access to the Trust property more difficult. They explained that the Trust currently provides access to the gate for family members and friends and for other individuals like hunters and "cattle people" by telling approved visitors the combination to the lock and then changing it as needed to prevent unauthorized entry. Their testimonies clarified that the parties currently do not need to communicate with each other to receive authorization to change a combination or to disseminate new combinations—the Trust changes the combination on its lock independently and at its convenience. Son testified that he did not know how to change the combination for an electric gate keypad.

¶18 After closing arguments, the court provided an oral ruling. It stated,

> The case law, really, is pretty clear on this stuff[;] this is fairly well-established law. . . . [T]he principle is that the person who has the dominant estate[,] which is, in this case, [C-B-K], can do whatever is necessary to enjoy [the] easement and keep it in repair, as long as [it] doesn't do something that unnecessarily inconveniences the owners of the

subservient estate, which in this case is the [T]rust
. . . .

. . . [T]his is obviously something that [Manager] wants to do for his own convenience, but that's not really the question that the law looks at. It doesn't concern itself with [C-B-K's] convenience, it concerns itself with the [T]rust's inconvenience.

. . . .

The gate that's currently there, though, obviously is defective at times. . . . [E]ven from the photos, you can tell that it hangs toward the ground . . . [and] it drags at times. . . .

. . . [O]bviously, this gate does not function always in a way that allows [C-B-K] to use [its] easement without interference. . . .

And so with that in mind, the question then really becomes, can [C-B-K] replace the gate with one that swings more freely or can [it] repair the gate that is currently there in a way that makes it swing more freely? And I think the answer to that question is absolutely yes. . . .

The harder question is whether that gate changes from a chain lock, which it currently has, to some sort of electronic opener. That's really the crux of all of this.

And the question with respect to the electronic opener is, for the [T]rust, are there times that it might fail? Is there a possibility that the solar panel might not work? Do the overrides possibly make it more difficult to use or make it more

susceptible to misuse by people who get up there and somehow override the mechanics? Are managing keys for the overrides and the number of clickers and all of those things somehow . . . an unreasonable inconvenience for the [T]rust? And the answer to that question, I think, is that yes, it is an unreasonable inconvenience for the [T]rust.

There are benefits, for sure, to an electronic gate, but there are also down sides to an electronic gate. They do fail. There's testimony that [Manager] had difficulty with his own electronic gate. There's also testimony that the [T]rust's experience with electronic gates has [included] some failures.

Moreover, the [T]rust has a method now of scrambling the security codes on its lock to try and prevent misuse or . . . unauthorized use of its own property. An electronic gate would prevent the [T]rust from using its current system[;] it would have to come up either with a way to [exchange] clickers, a way to exchange keys or a way to scramble the key pad in a way that would alter, for its own protection, the application.

And so the answer really comes down to this: [C-B-K], within the scope of [its] easement, can absolutely repair, at [its] expense, the existing gate, or replace the existing gate with something that works and swings more freely, but that [new] gate would have to swing freely and be attached with a chain lock like the existing gate . . . . [T]he mechanism for access has to stay the same; otherwise, it becomes an unreasonable inconvenience to the subservient estate, even if a portion of that inconvenience is speculative

inconvenience or even if a portion of that inconvenience arises because dealing with technology sometimes takes some time to accommodate . . . .

¶19 The court then issued written findings and an order consistent with its oral ruling. It stated, "The court orders that a change to an electric gate becomes an unreasonable burden to the subservient estate[,] even if a portion of this inconvenience is a speculative inconvenience." It further stated, "The court orders that the scope of the easement does not permit [C-B-K] to change the chain lock to an electronic access system."

¶20 C-B-K now appeals.

ISSUE AND STANDARDS OF REVIEW

¶21 C-B-K asserts that the district court erred in restricting it from replacing the current gate with an electric gate. Ultimately, C-B-K takes issue with the court's findings that "the scope of the easement does not permit [C-B-K] to change the lock to an electronic access system" and that "a change to an electric gate becomes an unreasonable burden to the subservient estate." In determining the scope of a prescriptive easement and whether a particular use of the easement would exceed that scope, "a district court must make a number of factual findings regarding the . . . nature of the easement's use." *SRB Inv. Co. v. Spencer*, 2020 UT 23, ¶ 6, 463 P.3d 654. The district court must also apply the correct legal standard to its findings. *See id.* "We review the district court's conclusions regarding the legal standard for correctness. And we review the court's factual findings, including how the court applied those findings to the correct legal standard, for an abuse of discretion." *Id.* (cleaned up). "[A]pplication of the wrong legal standard" is "an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 2, 367 P.3d 981.

ANALYSIS

¶22 In *SRB Investment Co. v. Spencer*, 2020 UT 23, 463 P.3d 654, our supreme court emphasized that there is "an important distinction between a prescriptive easement's 'type' (or 'purpose') and a prescriptive easement's 'scope.'" *Id.* ¶ 10. "Under this distinction, a prescriptive easement's type should be categorized broadly based on the general purpose for which the easement over the servient estate has historically been used. And a prescriptive easement's scope should be defined with particularity based on the nature, or extent, of that historical use." *Id.* Here, the type of easement C-B-K holds is an access easement, or an easement for ingress and egress. The scope of the easement and whether a particular use exceeds that scope, however, is determined through a fact-intensive inquiry applying the correct legal standard to the facts of the particular case. *See id.* ¶ 19.

¶23 The court in *SRB* provided useful guidance for determining an easement's scope:

> There are a number of factors that courts consistently consider in determining the scope of a prescriptive easement. . . . [T]he purpose of considering these factors is to determine the burden that has historically been placed on the servient estate. With this purpose in mind, courts almost always consider the physical dimensions of the historical use of the servient estate. They also consider the frequency and intensity of the use, as well as the effect of the use on the aesthetic and economic value of the property.

*Id.* ¶ 20. The *SRB* court clarified, though, that "the ultimate criterion in determining the scope of a prescriptive easement is that of avoiding increased burdens on the servient estate," and it directed courts to "consider any and all factors that may contribute to that burden." *Id.* ¶ 22 (cleaned up).

¶24    In this case, the Trust does not contend that C-B-K is seeking to expand the physical dimensions of the easement or the frequency of its use of the easement. Additionally, the district court did not explicitly reference intensity of use or the aesthetic and economic value of the property in rendering its decision regarding C-B-K's proposed changes to the easement. Rather, the district court analyzed several other factors in determining the burden historically placed on the Trust's land by C-B-K's use of the easement and whether the proposed electric gate would result in an unreasonable burden on the Trust's estate. In its oral ruling, the court discussed, among other things, how the gate had historically been secured by a chain lock and how the Trust "scrambl[ed] the security codes on its lock to try and prevent misuse or . . . unauthorized use of its own property." The court found that "[a]n electric gate would prevent the [T]rust from using its current system." The court also discussed the possibility that the electronics would fail or the override mechanism could make the gate "more susceptible to misuse." It ultimately concluded in its written order that "a change to an electric gate [would be] an unreasonable burden" on the Trust's estate.

¶25    In reaching this conclusion, however, the district court did not identify or apply multiple components of the legal standard that applies when a dominant estate owner seeks to make changes to the use of an easement. We identify those overlooked—and potentially overlooked—components and remand for the district court to apply the correct legal standard to the facts of this case.

¶26    The first part of the applicable legal standard the district court overlooked is that in evaluating a proposed upgrade to an easement, courts should begin with "the common law presumption that parties to an easement anticipate increased future use and reasonable technological improvements." *Stern v. Metropolitan Water Dist.*, 2012 UT 16, ¶ 69, 274 P.3d 935. Our supreme court has explained that "there is a firmly established background rule that an easement holder may make technological

upgrades to its property, so long as they are not unreasonably burdensome to the servient estate." *Id.*; *see also Hubble v. Cache County Drainage Dist. No. 3*, 259 P.2d 893, 896 (Utah 1953) ("[T]he law favor[s] changes and improvements for the benefit of the dominant estate so long as the manifest intent of the parties does not disallow the changes and the burden to the servient tenement is not increased."); *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 160 (Utah 1946) ("Plaintiff would not be exceeding its easement in improving its ditches provided the improvements are, under all the circumstances, made in a reasonable manner and they do not cause unnecessary injury to the servient owners.").

¶27   It is not clear that the district court applied this presumption. While the court acknowledged that there are both "benefits" and "down sides" to an electric gate, the court concluded that the "mechanism for access" to the easement could not be upgraded technologically because doing so presents "an unreasonable inconvenience to the [Trust's] estate[,] . . . even if a portion of that inconvenience arises because dealing with technology sometimes takes some time to accommodate." The court appears to have identified the fact that there is a learning curve associated with adapting to any new technology as at least part of the basis for its decision that the installation of an electric gate would result in an unreasonable burden on the Trust's estate. This runs contrary to the well-established presumption in favor of technological advancements. *See Stern*, 2012 UT 16, ¶ 69. On remand, the court should begin with the presumption that technological advances are favored and not assign an increased burden to the servient estate from the mere fact that some learning and adjustment are necessitated any time new technology is employed.

¶28   The second part of the applicable legal standard that the district court overlooked is that when a proposed change to an easement would, on its face, impose a burden on the servient

estate, that is not the end of the court's inquiry. "[I]n considering changes to the use of an easement or the servient estate, we apply a flexible rule that seeks to accommodate reasonable changes in use." *SRB Inv. Co. v. Spencer*, 2020 UT 23, ¶ 33, 463 P.3d 654. The *SRB* court explained that "the right of the easement owner and the right of the land-owner are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both." *Id.* (cleaned up). Accordingly, "in determining the scope of a prescriptive right, courts should take a flexible approach that permits changes of use so long as those changes do not *materially* burden the servient estate or *materially* interfere with the prescriptive right." *Id.* ¶ 38 (emphasis added).

¶29　In making this point, the court discussed its previous decision in *North Union Canal Co. v. Newell*, 550 P.2d 178 (Utah 1976):

> In that case a canal company sought to enjoin the owners of the servient estate from maintaining a fence around their property because it placed a burden on the canal company's easement right to enter the property for the purpose of performing maintenance on its canal. In considering this argument, we observed that whenever there is ownership of property subject to an easement there is a dichotomy of interests, both of which must be respected and kept in balance. We then noted that the fence constructed on the servient estate would interfere with the canal company's use and enjoyment of its easement. From this, we explained, the logical conclusion would seem to be that the fence should be removed. But we declined to order the fence's removal.

In declining to order such a stringent measure, we explained that the object to be desired in easement cases is to find some accommodation of those conflicting interests, to the maximum advantage and to the minimum disadvantage of both parties. So with this object in mind, we declined to order the removal of the fence, but we ordered the owners of the servient estate to maintain gates at reasonable intervals in the fence along the canal bank to allow the canal company access thereto as its needs may arise. Accordingly, our decision in *North Union Canal Co.* confirms that, in considering changes to the use of an easement or the servient estate, we apply a flexible rule that seeks to accommodate reasonable changes in use. And our case law suggests that a reasonable change in use is any change that does not materially increase the burden on the servient estate or materially restrict the use of the easement.

*SRB*, 2020 UT 23, ¶¶ 34–35 (cleaned up). In sum, a court should not end its inquiry when it identifies a burden that a proposed change will place on the servient estate; rather, if it finds that the change as proposed will place a burden on the servient estate, it should then determine whether there is an accommodation that will meet the needs and interests of both parties in a way that renders any resulting change to the burden on the servient estate a reasonable one. *See id.*; *see also Judd v. Bowen*, 2017 UT App 56, ¶ 42, 397 P.3d 686 ("The rights of the easement holder and the landowner must be capable of being balanced so as to afford each the ability to use and enjoy the rights attendant to use the property for a limited purpose on the one hand and ownership on the other." (cleaned up)), *cert. dismissed as improvidently granted*, 2018 UT 47, 428 P.3d 1032.

¶30    We do not see this flexible approach reflected in the district court's oral ruling or written order in this case. Regarding the proposed change to an electric fence, the court said, "[T]his is obviously something that [Manager] wants to do for his own convenience, but that's not really the question that the law looks at. It doesn't concern itself with [C-B-K's] convenience, it concerns itself with the [T]rust's inconvenience." But as *SRB* and *North Union Canal Co.* illustrate, that is not entirely true. *See SRB*, 2020 UT 23, ¶¶ 34–35; *North Union Canal Co.*, 550 P.2d at 179–80; *see also Mize v. Ownby*, 225 S.W.2d 33, 34 (Tenn. 1949) (considering the dominant estate's "annoyance in opening and closing gates"); *White v. Allen*, 2005 WY 72, ¶¶ 13–17, 115 P.3d 8 (discussing the inconveniences to a dominant estate owner's use of an easement containing a double set of manual gates, and affirming the district court's ruling that the dominant estate owner could replace the gates with cattle guards for his convenience); Restatement (Third) of Property: Servitudes § 4.10 cmt. c (Am. L. Inst. 2000) ("This section states the general rule that the holder of an easement is authorized to make any use of the servient estate that is reasonably necessary for the *convenient enjoyment of the easement*." (emphasis added)); *id.* cmt. e ("When reasonably necessary *to the convenient enjoyment of an easement*, the holder of the easement may make improvements and construct improvements on the servient estate for enjoyment of the easement. These rights are subject to . . . the proviso that the holder of the servitude is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment." (emphasis added)). Again, district courts are expected to consider the needs and interests of both parties to an easement and may use their equitable powers to accommodate them.

¶31    While the district court here did rule that C-B-K could repair the existing gate or replace it with a similar gate secured by a chain lock, that ruling merely addressed the problem of the existing gate "not function[ing] always in a way that allows [C-B-K] to use [its] easement without interference." But C-B-K

proposed the electric gate not just as a solution to the occasional malfunctions of the existing gate but also as a standalone improvement. Manager testified that the "number one" reason he wanted to replace the gate was his "age and health problems," but his "number two" reason was for ease of use and improved appearance: "[I]t's just so much handier to push a button, the gate opens, you drive through it and go on. And after a minute it will automatically close. . . . And it's a much, much prettier gate." Even if Manager's first reason for proposing an electric gate was to remedy the defective nature of the current gate, his second reason for proposing an electric gate was to increase C-B-K's ease of use of the easement and to improve the appearance of the easement's access point. And the court's ruling did not address these points or seek to accommodate C-B-K's interests in these respects.

¶32    The district court, on remand, should perform the type of accommodation analysis discussed above to determine whether both parties' needs and interests can be met to some degree. If it identifies an acceptable accommodation, implementing it "concededly will require some maturity of attitude and cooperation between the parties." *North Union Canal Co.*, 550 P.2d at 180. If, on the other hand, the court determines that accommodating both the Trust's and C-B-K's needs and interests is not possible without imposing an unreasonable burden on the Trust's estate, its order should include findings of the specific inconveniences that would unreasonably burden the Trust's use of the property and why no accommodation could sufficiently mitigate those inconveniences.

¶33    The third part of the applicable legal standard that the district court may have overlooked is that when determining whether a proposed change to an easement will result in an unreasonable burden to the servient estate, a court may not give weight to burdens that are "purely speculative." *Metropolitan Water Dist. v. Questar Gas Co.*, 2015 UT App 265, ¶ 40, 361 P.3d 709, *cert. denied*, 369 P.3d 451 (Utah 2016). While the court may

consider a burden that has some likelihood of arising due to a proposed change, *see* Restatement (Third) of Property: Servitudes § 4.9 cmt. c (Am. L. Inst. 2000) ("Whether the improvement is an unreasonable interference with the servitude depends on the character of the improvement and the likelihood that it will make future development of the easement difficult."), burdens about which the parties can "only speculate" are not appropriate for consideration when evaluating the reasonableness of the use of an easement or of the servient estate, *Questar Gas*, 2015 UT App 265, ¶¶ 32, 40.

¶34    For example, in *Questar Gas*, a water district filed a complaint alleging that the unlicensed presence of a natural gas pipeline running through its pipeline corridor unreasonably burdened the easement, and our court held that evidence of future burdens due to circumstances about which the easement holder could "only speculate" did not create a genuine issue of material fact as to the present existence of an unreasonable burden. *Id.* ¶¶ 2, 3, 11, 32, 40. The water district "conceded that it ha[d] no present plans to do any work" in the easement, citing only "'preliminary plans' for replacement work sometime in the next several decades," and we concluded that, "[a]s such, the [water district] ha[d] no way of knowing with certainty what repairs and rehabilitation work, if any, will be undertaken in the future, nor what the scope and nature of those potential construction projects will be." *Id.* ¶ 32. Accordingly, we called "any suggestion that Questar would not accommodate the [water district's] rehabilitation work when acquainted with [its] plans" "entirely speculative." *Id.* We highlighted how, "[u]nder *the present facts*, there is no indication that Questar's pipeline unreasonably interferes with the [easement]," and we determined the water district's "claim that Questar's pipeline *will* interfere with its future construction plans" "purely speculative at this time." *Id.* ¶ 40 (emphasis added). We stated that "we will not reverse the judgment of the district court on the basis of

what *might* happen if the [water district's] contemplated repairs do in fact occur." *Id.*

¶35 Here, the district court found that an electric gate would unreasonably burden the Trust's estate, "even if a portion of that inconvenience is speculative inconvenience." Without more explanation, however, we are unable to discern whether the speculative inconveniences the court identified amounted to purely speculative burdens or to burdens that have at least some present likelihood of arising. While the Trust's witnesses testified that an electric gate would frustrate their current system of changing and sharing their combinations—a clearly nonspeculative inconvenience—they also testified to some concerns that may have some present likelihood of arising or may be purely speculative, including fears that an electric gate would be less effective during a fire or other emergency, that people would disassemble the gate or break the gate's solar panel,[2] and that passersby would interpret the electric gate as a signal that the property housed valuable items and therefore decide to break into and damage the Trust's estate. The Trust provided evidence that its signs and gate had been tampered with before, but it did not provide more than its own bare assertions of concern to support several other alleged inconveniences that would result from installing an electric gate. Because the court acknowledged that some portion of the overall inconvenience the Trust identified is speculative and did not, when making its finding that an electric gate would unreasonably burden the servient estate, explain that it was not relying on purely speculative burdens, we cannot determine whether the court improperly gave weight to purely speculative burdens. The evaluating and weighing of alleged

_____

2. Even if this is not a purely speculative concern, C-B-K's agreement to bear the cost of maintaining an electric gate, coupled with the existence of mechanical workarounds that could be employed until a repair could be made, largely, if not wholly, mitigate any burden on the Trust due to a broken solar panel.

inconveniences are tasks reserved for the factfinder. *See Stern v. Metropolitan Water Dist.*, 2012 UT 16, ¶ 73, 274 P.3d 935 (reiterating that "reasonableness and the materiality of a burden are questions for the fact finder"); *McBride v. McBride*, 581 P.2d 996, 998 (Utah 1978) ("The determination of the reasonableness of locked gates is necessarily governed by the facts of each case . . . ."). On remand, the court should identify the inconveniences it bases its decision on and clarify that its finding as to whether the proposed gate unreasonably burdens the Trust's estate does not rely on purely speculative inconveniences.

CONCLUSION

¶36    The district court did not apply the correct legal standard to determine the scope of C-B-K's easement. Therefore, the court exceeded its discretion in finding that C-B-K's proposed electric gate would unreasonably burden the Trust's estate. We reverse and remand this matter for the court to perform that evaluation under the correct legal standard. On remand, the court should apply the legal presumption in favor of technological advancements, determine whether an accommodation of both parties' interests is possible without imposing an unreasonable burden on the servient estate, and not consider purely speculative burdens on the servient estate.

――――――――